3-09-0988 Rossville Land Investments Accounts v. John P. Peoria County Board is lead by Rolinda VanLine In the interest of having consistent rulings in both cases, I'm very pleased to see the three of you again. As you of course know, we're here to discuss administrative review, in this case, of two decisions regarding some special use permits that were denied by the County of Peoria. Now, in preparation for this argument, I had an opportunity to review the briefs, and there are lots of them. Obviously, there are three briefs on this appeal. There were essentially six briefs before Judge Borden in the trial court, all of which covered pretty much the entire waterfront of material that's before the court. And as a result, I am not going to rehash all the factual arguments on each of these points that have been raised in the various briefings. I'm not going to talk about IDOT and traffic and those things, because they really have been very thoroughly briefed, I believe. So unless the court has specific questions, which I would be more than happy to address, I prefer to focus on sort of a thematic content rather than a specific topic. I would like you to talk about the jurisdictional issues, going back to last month's case and this month's case, and how we're to make sure we've got some symmetry here. Yes. Now, having read Our Savior since I saw you last, jurisdictionally, is there an issue? If we were to follow their approach and send this back for a legislative hearing in front of the trial court, would that move Mossville to the other case? Essentially, yes, if this court has the power to do that. And the purpose of filing Mossville 2, as we discussed, was to make sure that if the court decided it. Assuming we have that power. If the court has the power. The second district obviously thought it did. It did. Its facts were somewhat distinguishable, I think. I understand that. But yes. Yes, it would. I'm not telling you. I understand, Your Honor. Oh, definitely. I'm just saying that that would be the case. Essentially, to play it out a little more, we'd of course have to, when the court dismissed the legislative case for essentially mootness, because of the remand in this case, we would probably analyze it a little more at that point and think, do we need to appeal this again? Or could we potentially ever lose our right to legislative review? I think, Your Honor, frankly, that if this court did remand for a de novo legislative hearing, as the language is used in the 2009 amendments, that probably would moot the legislative review case. And I'm glad that the court has had an opportunity to review the Our Savior case. Frankly, we were just not able to find anything equivalent in the third district or from the Supreme Court that is as clear as that case. And that case fortuitously came down during the pendency of all this. Frankly, we disagree with the holding in Our Savior. We think that this is an administrative review case. Well, and you did it in the trial court as well. Yes. But the county actually filed that motion to have it heard legislatively. Exactly. And you opposed it. Correct. And won. And we still believe that administrative review is the proper method of review. And that is why we're before the court today. If we didn't agree with that at the trial court level and then here on appeal, we probably could have at various points dismissed this matter voluntarily. But we do believe this is the correct mode of review from a review of the relevant review provisions in the county's code at the time we filed this case initially. And on further reflection, we still believe that administrative review is the correct mode of review in this case. And why is that? Because of the language of the statute as it existed at the time the decision was rendered. So at the time the decision was rendered by the – In the county board. No, I'm sorry. Actually, by the county board. Yeah, I'm sorry. I thought you said county board. By the county board, indeed. At the time that the county board rendered its decision in this case, it is very clear that the law provided that that decision was to be reviewed in an administrative fashion through administrative review. And I believe that that was the finding of Judge Borden in the trial court in this case. The question that was visited by our savior, by the court and our savior, was did the subsequent amendment during the pendency of the suit of the review provisions in the county's code, in that case it was the city's code, within the county's code, mandate a switch in the middle, an immediate rest to stop where we were and restart as a legislative de novo proceeding. And I think the answer, it has to be no. Because exactly the problem that was identified by the court and our savior would happen here. The court doesn't have the sort of record that it would need to determine this on a legislative de novo basis, so you end up remanding. Well, it's been years. And that's not, that is grossly, I think, prejudicial to both parties to restart from the beginning at this point. And I just simply do not agree that that is required under the law. Obviously, Judge Borden didn't have the benefit of the our savior decision at the time he ruled in the trial court, but his determination that this was properly administrative, I think, is the correct decision still. Okay. Thank you. Well, Your Honors, what I'd like to talk about just very briefly is a couple thematic points that have raised really throughout the briefing on this from a factual standpoint. The first is, what is a property owner required to do to obtain a special use permit? What sort of evidentiary presentation is required at the Zoning Board of Appeals hearing? And really, when is enough enough in terms of what one must present? So as you know from reading our briefs, there are five basic criteria that the Peoria County Board looked at to determine the special use permits. Two of those, there's no argument, were met, were satisfied by MLI in this case. The other three, consistency with comprehensive plans, consistency with community character in the immediate vicinity of the parcels, and minimizing of adverse effects on adjacent properties, were found to be disputed. Now, the trial court, obviously, Judge Borden found that Mossville met the second and third of those elements and upheld the county board's decision only on the question of consistency with the county's comprehensive plans, which I will address briefly in a moment. So the question for me, though, is standing back and saying, okay, we're going to do manifest weight of the evidence, we're going to review everything in the record. What is it that we could have done here and didn't do that would have given the court a greater comfort level, given the county board a greater comfort level with finding in favor of our special use permits? Should we have conducted a countywide economics analysis of exactly the need for this special use permit? Well, no, I don't think so. I don't think that's required to get a special use permit. Should we have hired an expert in human biology to say exactly how far away the human ear can hear sounds of machinery? No, I don't think that that is required. What we needed to do was show enough evidence to present enough evidence to show that we had, in fact, consistency with comprehensive plans and community character and that we were going to minimize adverse effects on adjacent properties. Insofar as there was any additional questioning on the part of the county board, they could always have asked us or required us to prove additional factors. So which factors did Gordon say that you met out of those five? All of them other than consistency with the comprehensive plans. Okay, but you're talking about other factors here that you would have used some evidence for, right, to demonstrate. Sure. I believe that we are consistent with the comprehensive plans on their basis, just as it stands. I think we have sufficient evidence in the record, frankly, on all of these to prove that we are consistent with the comprehensive plans, we are consistent with the community character, and also minimize adverse effects. The only one that's disputed is the comprehensive plan. Well, Your Honor, because this is administrative review, it's our understanding that the county board can continue to maintain its positions, but this court is reviewing the administrative decision rather than the intermediate review conducted by Judge Borden. Now, frankly, I think Judge Borden's analysis was entirely accurate, and I support his decision entirely on counts two and the second and third elements, and so really my intention today was to focus on the first element, which is consistency with the comprehensive plans. And I can just turn to that now. And this was actually my second running theme that I wanted to talk about because it hits on really more than one of the factors, which is what is consistency? What does this term mean? What does consistent with something mean? Under the Peoria County Code, under the law, under the English language, obviously it doesn't mean the same. And in the response, the county has demonstrated for us what it means when it says consistent by using the example of the four types of residential use permitted under the A2 zoning as being consistent. So essentially, you can have one of these four kinds of residential use within A2 zoning, and those residential uses are consistent with each other. Frankly, I don't think that's what the code or what the law really stands up for or stands for because, in fact, all the permitted uses under A2 would be consistent, and that includes corn processing plants, single-family dwellings, dairy and poultry farms, commercial and wholesale greenhouses, public utilities structures, and other things, which, while they're not the same, have been found to be consistent. So I think that the county is really using a standard that doesn't exist in the code. It's trying to say now that only, for example, those four residential uses under A2 would be consistent with each other and putting a corn processing plant next door would not be consistent. Well, that's just not true under the code as it exists. So consistent can mean different. In this case, specifically talking about the comprehensive plans, those plans provided that the county should provide opportunities to utilize mineral resources to the extent that they can be removed economically and without long-term degradation to the natural environment or conflict with other land uses. So there's no argument that the zoning of our properties is consistent with the comprehensive plans and it will, in fact, be maintained under the comprehensive plans. So there's no plan to change the zoning for our parcels. It's going to stay A2 and I2. And these two parcels and the surrounding parcels are all A2 and I2 as well, notably. There is a consistency there. There's no plans to turn this into rural residential, which would be, obviously, an intensive residential use. So we believe it's consistent from that perspective with the comprehensive plans. We're not derailing any sort of new use projects. Now, in terms of long-term degradation of the natural environment, there is nothing in the record that supports a finding that this would contribute to long-term degradation of the natural environment. In fact, the evidence that's been presented in the record shows that this is essentially a completely neutral use. We've presented the testimony of Steve Kroll, who's an expert hydrogeologist from Patrick Engineering, perhaps even more, well, more obviously objectively, though of course we believe Mr. Kroll is entirely objective in his presentation, is the Illinois State Water Survey opined that there would be no negative impacts on the aquifer as a result of this project. And I believe that that opinion was actually elicited at the request of one of the opponents of this project. We did not ask for that opinion from the Illinois State Water Survey, which is an independent governmental body having nothing to do with us. So long-term degradation to the natural environment, there's absolutely no proof that that would be an issue here. And finally, conflict with other land uses. Now, this is really where the focus has been. Now, I feel that Judge Borden's order has an inherent inconsistency on this point because he found that we in fact were consistent with the community character of the surrounding parcels and he found that we were minimizing adverse effects on adjacent parcels. So how is it there's a conflict with other land uses if we are in fact consistent with the community character and have minimized adverse effects on the surrounding properties? So from that perspective, we simply don't see that there's any indication that there has been any, that this would be in any way inconsistent with the surrounding uses. Now, interestingly, the county has taken it upon itself in its ordinance to take steps to ensure that this particular use of mineral extraction facility is compatible and consistent with A2 and I2 zoning by mandating limited hours of operation, burning, fencing in some circumstances, and a 1,000-foot setback from the nearest roadway. We have abided by all of these requirements. And frankly, under these special use powers, the county could have required additional measures if it felt that they were specifically needed. This isn't really a safety issue. It's not a consistency issue, and I think we do know what it is because one has to ask themselves, what would an applicant need to present at a hearing in order to obtain a special use permit for a mineral extraction facility in front of Peoria County? And they were so kind as to tell us in their responsive brief. They said that the property that is sought to be developed has to be zoned industrial, used for industrial purposes currently, and surrounded by non-residential uses. Well, this is simply not what the ordinance says. And I would encourage the court to just go back to the ordinance, look at the five factors, and think about what has been presented. I believe that the evidence in the record, the manifest way of the evidence, wholly supports awarding these special use permits and permitting us to apply this lawful use to our property. Thank you. Thank you, counsel. Is it Manline? Yes, Your Honor. Ms. Manline, you may respond. May it please the court, counsel. My name is Melinda Manline, and I represent the defendant, Apolli, in this case, the Peoria County Board. Now, as plaintiff's counsel aptly presented, there is evidence in the record that supports the granting of plaintiff's special use petitions. However, more importantly, and the most important theme in this case, is that there is evidence in the record supporting the board's decision to deny plaintiff's special use petitions. And according to the Supreme Court of Illinois in Abrahamson v. the Illinois Department of Professional Regulation, if there is evidence in the record that supports the board's decision, it must be affirmed, even if an opposite conclusion is reasonable or this panel might have decided otherwise. To address briefly the jurisdictional issue, which has been an issue in both this case and Moscow too, our position regarding our savior evangelical Lutheran Church is, as I presented in our brief, that it shows that both the administrative and legislative reviews can take place within a single case. In plaintiff's reply brief, they maintain for the first time that the reason both types of review could be maintained in that case is because the law changed under the appendix of the appeal. And that doesn't apply to this case. However, the entire reasoning behind the second district's ruling regarding jurisdiction was that law change. So if this court is going to follow the second district's reasoning regarding the jurisdiction, then this court could also follow the second district's reasoning regarding having both types of review in one case. And obviously, our opinion would be that if this court decides that legislative review is proper and remains it in this case, it would moot Moscow too. Likewise, if this court decides that administrative review is proper, that would also moot Moscow too. As has always been our position, there's never been a need for a second case regarding this exact same issue. As far as the board's findings of fact, they found that plaintiff's special use petition did not meet three sections of the Peoria County Code. Section 24-5-5D1, 2, and 3. That it was inconsistent with the land use plans. That it was inconsistent with community character. And that it created adverse effects. And as plaintiff's counsel pointed out, we did brief these facts quite at length. And so I'm just going to do a brief summary of what facts support the board's denial of plaintiff's special use petitions. With regards to the land use plans, and the court found this as well, that plaintiff's special use petitions were inconsistent with the land use plans. That's the finding that the court made. The trial court. Sorry, Your Honor. Under both plans, Parcel A is designated for industrial office and research use. But it only promotes such use if it does not degrade the residential and environmental developments around such proposed use. The Peoria County land use plan also discourages the wide distribution of non-agricultural industrial activity throughout the unincorporated county. Parcel A is currently being used for agricultural purposes. So obviously, taking that land out of agricultural use and converting it to a gravel pit would create a non-agricultural activity in the county in contravention of the land use plans. Yeah, but is the land use plan illogical? I mean, you go where minerals are. You can't move minerals to a consolidated industrial area. That is quite true, Your Honor. But at the same time, plaintiff could find a parcel that is more consistent with the surrounding character in the land use plans. Plaintiff maintains that the county's position- But the gravel is, you know- Right, but I would maintain that not every single location where a gravel pit could locate in the county is surrounded on three sides by residential and agricultural uses. And I'm sorry, that's what I was trying to get to, Your Honor. Go ahead. Plaintiff has maintained that the county board's position means that no gravel pit could be developed in any area zoned A2 or I2, and that's simply not the case. That would only be the case if every parcel zoned A2 and I2 was surrounded on three sides by agricultural and residential uses. And if every parcel was located next to a narrow county highway with a 55 mile an hour speed limit, where residents were concerned that the trucks could not pull out or pull into plaintiff's parcel without crossing the center line and crossing into oncoming traffic, creating a safety hazard, that wouldn't necessarily be present in every single parcel zoned A2 and I2. There wouldn't necessarily be 20 school buses traveling alongside every parcel zoned A2 or I2. There are things specific to this parcel that would not be applicable to every other location in the county where gravel might be produced. And specifically with parcel B, the land use plans designate it as being agricultural use. And it currently is an agricultural use. In fact, the land use plans, one of the objectives is to preserve agricultural land as a resource, and also to minimize the conversion of agricultural lands for non-farm development. Obviously, plaintiff is proposing to convert agricultural land for non-farm development, which is completely opposite of the goal of the plans. Can it be reconverted back to agricultural? I mean, or is that being discussed in the line of these petitions? I do not believe that it's ever been discussed, Your Honor. It could be converted back to agriculture at a later time, yes. The second finding that the board found that plaintiff's petition did not meet was consistency with community character. As already mentioned, the parcels are surrounded on three sides by agricultural and residential uses. The only industrial use in this area is to the south. Obviously, only being in conformance with or similar to 25% of the surrounding uses would be inconsistent with the community character. Now, plaintiff's counsel did pose the question of what is consistent. And I think there's a spectrum of consistency in this case. I think having a subdivision next to heavy manufacturing is fairly inconsistent. I don't think that there would be a question of whether that is consistent with one another. They're completely separate things. Plaintiff proposed that there can be houses and seed processing and agriculture in the same area. And those would be, I think, slightly more consistent. If you have a farmhouse on acreage, on many acres where farming is being conducted and also seed processing is being conducted, those all relate to each other, whereas a subdivision next to a manufacturing would be completely different and inconsistent in our view. And finally, there are adverse effects created by plaintiff's special use. There is testimony that there would be visual and noise effects, as well as impacts on the surrounding traffic system, which I briefly touched on earlier, and contamination of the Sanctity Aquifer. Plaintiff maintains that there is no possibility of contamination. However, plaintiff's own expert's report stated, the operation of an open pit mine at the site will add a potential source of aquifer contamination and create an additional pathway for contamination. Plaintiff's expert also testified that the fuel tanks would pose an additional risk to the aquifer. And plaintiff testified that it has no plans for installing monitoring wells or any standard spill response or a cleanup procedure so that it can minimize any risk of contamination to residence wells that are nearby if a spill occurred. And consequently, our position is that the record supports the board's findings of fact that the plaintiff did not meet sections 25-5-5, D1, 2, and 3. Now, plaintiff also brought up- Did the county require those protections? If you're having a special use? Well, that is what I was getting to now, Your Honor. Plaintiff brought up the fact that the county could have imposed conditions. And specifically, the ordinance reads, the county board may attach and the zoning administrator and ZBA may recommend the attachment of such conditions to a special use permit as are reasonably necessary to meet the standards in subsection D, those standards that we've been discussing today, including, but not limited to, requirements for landscaping and lighting, provision of adequate ingress and egress and off-site project-related improvements, and other conditions such as the duration of the permit, hours of operation, and mitigation of environmental impacts. In this case, because of the many areas where the county found plaintiff's petition lacking, the number of conditions would include landscaping, additional landscaping to shield residents from the visual and noise impacts of plaintiff's proposed use, adequate ingress and egress, or off-site improvements to county roads so that plaintiff's trucks could enter and leave their site without crossing the center line and endangering school children whose buses are passing by, restriction of hours of operation, potentially, so that trucks wouldn't be entering and exiting at the same time that school buses are passing by. Plaintiff would need to install monitoring walls or have some sort of spill cleanup plan in place to minimize the dangers of environmental degradation. They could also, we would also require a dust plan being instituted, which plaintiff on the record said they had no plans currently for a dust mitigation plan. So given these extensive lists of the conditions that would be necessary in order to bring plaintiff's proposal up to the criteria listed in the county code, another reasonable alternative would just be to deny it altogether and certainly much more easily enforce. Isn't that an economic decision, those seeking a special use permit, not really a concern of the government if they put the conditions on? You tell them if they're met, you tell them if they're not? Well, but it would be a problem of trying to enforce all those conditions, I think, Your Honor. How would we monitor them constantly for the at least seven or at least five conditions that would be on that property? And the conditions are optional. They're not something that the board is mandated to place on plaintiff's special use in order to bring their petition up to the criteria of the county board. No, but they could condition any granting of the special use. All of the criteria that the county board could come up with to protect the public interest, couldn't they? They could, Your Honor, but I think then the plaintiff could argue that it was constructively denied because of all the restrictions that were applied to that special use permit. In sum, I think the most important theme of this case is that there's evidence in the record supporting the board's denial of plaintiff's special use petitions, and that means that their decision must be affirmed. Unless the court has any further questions? Ms. Nair, you may reply. Thank you, Your Honor. We still believe this is the right project at the right place, and I think, actually, counsel's recitation of the potential five conditions that the county would have put on the issuance of these special use permits really demonstrates that this is the right project in the right place. Those are probably fairly reasonable conditions. I guess it depends how they'd have drafted them, but this is, as Justice Holdren just pointed out, this is where the mineral deposits are, and we're in an agricultural and industrial area. Those are definitely the predominant uses, especially coming right up after Buckeye and the Caterpillar facilities to the south. We believe that this specific spot, its highest and best use would definitely be a gravel extraction facility. We have a parcel zone I-2. We could put smokestacks up tomorrow, but what we'd like to do is something that's more of a compatible use, frankly, with the surrounding agricultural uses. Parcel B is zone A-2, but the soil is so poor that even the zoning administrator who recommended denial of special use permits listed that as a factor in favor of approval of the special use permits. This is bad soil. It's what makes it such great mining material. Under the A-2 classification, what were the permitted uses? Under the A-2? Yes. Oh, there's all sorts of... But you named some of them, didn't you? Sure. I named poultry and livestock farming, dairy farming, corn processing, which I don't know if that would mean ethanol plant. That was my question. I'm fairly sure that means ethanol plant because I can't think of much other corn processing facilities that would be done. And other uses, wholesale materials, retail, landscape materials. Milling operations, something of that nature. I would think so. That is what a corn processing plant would do. So these are substantial uses that could be put on that property and for which it would be suited and for which we wouldn't even need a special use permit. But we are seeking a special use permit because this is the perfect spot, really, for a mineral extraction facility. It's a heavily industrialized area. We have a heavy industrial truck route leading to this property, leading right past this property. It's 55 miles an hour, but it's 80,000-pound trucks rated. This proposed development would result in a 1% increase in traffic on that road. A 1% increase. It's hard to think of a place where you'd have less of an impact than 1%. Now, there's really no proof as to the aquifer that there would be any negative impact. I know that council has quoted some very specific provisions, and I think I've addressed those fairly fully. The one thing I would point out just once again is this question of whether putting a fuel tank on a property, this is something that is not unique to a mining facility. That is going to be true with any major agricultural operation, probably with any major industrial operation as well. So that is not a reason to deny this special use. That's a reason to maybe change your ordinance entirely to say you can't have A2 or I2 properties that have fuel tanks because that is not related to using this in the manner that we're seeking, really. That is an independent thing that could very easily occur regardless of whether we're doing this use or some other use. So you're saying a special condition of no fuel tanks could be imposed? Frankly, I don't think that would be appropriate because that is a normal function that you'd find on any agricultural industrial property. It's not unique to this. It's unique in the sense that it seemed that the report suggested you have that portal to the aquifer when you have an open pit mine. Actually, taken as a whole, I believe that what the testimony showed at the hearing was that because the water is exposed in this gravel extraction facility, it's actually easier to clean up. You're not removing oil. You're just cording it off and scooping it off the top. We don't have waves like in the Gulf of Mexico in our little lake here. I mean, we can control that spill if it were to occur. Furthermore, we have an obligation to minimize adverse impacts, and that would include minimizing the effect from this tank. And there was testimony in the record that we were going to build a concrete container around this tank that would prevent any oil, even in the event of a rupture, from escaping, something that was solid enough that it would be dummy-proof, to use Stan Mack's Irish term. You could back a fork truck into it, and it would not move. So that is minimizing the adverse impacts of building a concrete box around this potential source of contamination. And frankly, it's much more extreme than what would be required if it were a farm. And I think it's beyond the standard of care that would be required. Though the court, I think, very accurately asked Ms. Manline what is required in the county's plan regarding monitoring wells, dust mitigation, and so on. There's nothing in the code that requires you to have a dust mitigation plan or install monitoring wells in any particular way. Now, I think that taken as a whole, it's pretty clear what the county's position is on this. And as they said in their brief, needs to be industrially zoned, needs to be currently used for industrial purposes, and needs to have no residential anywhere around it. Well, that is simply not what the code requires. And I would submit to the court that we have, in fact, met all of the standards that have been set forth in the code itself. And I would ask that the court overrule the decisions of the county board and the trial board. If there are no other questions. I don't believe there are. Thank you all for your time this afternoon. Thank you, Council Paul, for your arguments in this matter this afternoon. It will be taken under advisement. Written disposition shall issue, and the court will stand in brief.